IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,541

STATE OF KANSAS,
*Appellant,*

v.

MEGAN GARDNER,
*Appellee.*

SYLLABUS BY THE COURT

1.

A judge presented with a search-warrant application must consider the totality of the circumstances and make a practical, common-sense decision about whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. Probable cause is a fluid concept that requires only a probability or substantial chance of criminal activity, not an actual showing of such activity, and it is not a high bar.

2.

When a defendant later challenges a judge's decision to issue a search warrant based on an allegedly deficient affidavit, the reviewing court—whether it is a district or appellate court—does not decide the probable-cause question anew. Instead, the reviewing court asks whether the issuing judge had a substantial basis to conclude that probable cause existed. And in answering that question, the reviewing court considers the full picture and must not engage in a divide-and-conquer analysis that takes facts one by one and discards circumstances consistent with innocent conduct when the combined weight of the evidence supports the issuing judge's conclusion.

Review of the judgment of the Court of Appeals in an unpublished opinion filed September 12, 2025. Appeal from Leavenworth District Court; CLINTON LEE, judge. Oral argument held April 7, 2026. Opinion filed July 10, 2026. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded.

*Tyler W. Winslow*, assistant solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for appellant.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: Leavenworth police were investigating fatal overdoses linked to fentanyl-laced counterfeit pills known as "blues." They suspected the supplier was operating out of Megan Gardner's home. After several weeks of surveillance on Gardner's house and an apartment, an officer compiled the investigation's findings into an affidavit and applied for a warrant to search Gardner's house. A judge granted the warrant. Police searched the home, found drug evidence, and the State charged Gardner with several crimes.

Gardner later moved to suppress. She argued the affidavit failed to establish probable cause and that all evidence from the search should be suppressed under the exclusionary rule. The district court agreed and suppressed the evidence.

A Court of Appeals panel also found the affidavit deficient. But a majority concluded that the evidence was admissible under the good-faith exception to the exclusionary rule.

We disagree with how those courts applied the legal standard for reviewing a judge's decision to issue a search warrant. A judge presented with a search-warrant

2

application evaluates the totality of the circumstances and makes a practical, common-sense judgment about whether there is a fair probability that evidence of a crime will be found in a particular place—the probable-cause decision. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). When a district court or appellate court later reviews the decision of the judge who issued the warrant, it does not decide the probable-cause question anew. Instead, the reviewing court—whether a district court or appellate court—asks whether the issuing judge had a substantial basis for concluding that probable cause existed.

And in answering that question, the reviewing court considers the totality of the circumstances. *State v. Mullen*, 304 Kan. 347, Syl. ¶ 4, 371 P.3d 905 (2016). It does not engage in a "'divide-and-conquer analysis'" that takes facts "one by one" and "dismiss[es] outright any circumstances that were 'susceptible of innocent explanation.'" *District of Columbia v. Wesby*, 583 U.S. 48, 60-61, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018); *State v. Cash*, 313 Kan. 121, 133, 483 P.3d 1047 (2021) (adopting totality-of-the-circumstances analysis and rejecting a divide-and-conquer analysis).

Neither the district court nor the panel adhered to that standard. They both considered the affidavit's weaknesses in isolation rather than weighing the evidence in its entirety. Evaluated under the controlling standards, we conclude that the affidavit provided the judge who issued the warrant with a substantial basis for probable cause.

The affidavit detailed a trash pull at Gardner's residence that yielded significant evidence of drug activity and mail addressed to Gardner at that address. It identified independent sources of information suggesting that a person known to frequent the house was involved in counterfeit-pill trafficking. It described repeated short visits to Gardner's house that were consistent with narcotics sales. It documented frequent traffic between Gardner's house and another suspected distribution point—traffic that included Gardner's

own car. And it discussed paraphernalia found in Gardner's car after it was repossessed. Together, that information gave the issuing judge a substantial basis to find probable cause.

We thus affirm the panel majority's decision to reverse the district court's suppression order, though on different grounds. And because we conclude that the affidavit provided the issuing judge with a substantial basis to find probable cause, we need not address the good-faith exception.

FACTS AND PROCEDURAL BACKGROUND

In March 2023, a woman died of a suspected fentanyl overdose in Leavenworth. Detective La Carol Kennedy was investigating the source of the fatal drugs. There had been several overdoses in the city tied to counterfeit fentanyl-laced Percocet "M30" pills.

Sources "within the Leavenworth Police Department and outside agencies" told Detective Kennedy that David Kelly had sold the drugs. Weeks later, a named informant showed the detective screenshots of a conversation stating that the overdose victim had bought the drugs from Kelly at the Woodland Village complex. Detective Kennedy used the complex's surveillance system to identify an apartment Kelly had entered. Around the same time, an anonymous caller left a voicemail reporting that someone was selling drugs at a Columbia Avenue address "out of a red car." Detective Kennedy knew that given address as Gardner's house.

Over the following weeks, Detective Kennedy surveilled Gardner's house and the Woodland Village apartment. She observed Kelly and others at both locations, along with several vehicles, including Gardner's Kia Soul and a maroon Ford Escape. The Ford Escape's color was generally consistent with the anonymous caller's report of drug activity from a "red car" at that location.

4

While surveilling Gardner's home, the detective saw four short-duration visits to Gardner's house that she deemed consistent with drug transactions. She also observed an associate of Kelly's at Gardner's house. That associate had also been present at the scene of two overdoses that occurred during the investigation in this case. He told officers at one of those scenes that the victim "could have taken some blues."

A separate investigation linked Kelly to the purchase of a stolen firearm. A witness involved in that case told another detective that Kelly had bought the firearm for "[f]ive hundred dollars and 100 pills (blue pills)." And the suspect who had allegedly stolen the firearm told officers that Kelly had "thousands of pills."

Detective Kennedy later searched Gardner's Kia Soul after it was repossessed. She found drug paraphernalia, including a mirror with residue that tested presumptive positive for fentanyl. She also conducted a trash pull at Gardner's house. The trash pull yielded sandwich baggies with corners cut, a handwritten ledger with names and dollar amounts, mail addressed to Gardner at the address, mail addressed to Kelly (albeit at a different address), and residues that tested presumptive positive for fentanyl, methamphetamine, and marijuana.

Based on her investigation, Detective Kennedy concluded that Kelly and Gardner were likely working with coconspirators to distribute narcotics from her house and the Woodland Village complex. She compiled that information in an affidavit and applied for a warrant to search Gardner's house. A district court judge granted the application.

When Detective Kennedy executed the warrant, she found counterfeit Percocet M30 pills, multiple baggies of suspected fentanyl in powder form, suspected methamphetamine, marijuana, digital scales with residue, glass smoking pipes, and loose

packaging materials. The State charged Gardner with possession of methamphetamine with the intent to distribute, distribution of fentanyl, and possession of drug paraphernalia.

Gardner moved to suppress that evidence, arguing that the affidavit failed to establish probable cause. In her view, the affidavit was filled with conclusory assertions, unverified tips, and observations of entirely innocent activity, none of which established a substantial link between drug activity and the residence. She argued that the facts about the trash pull were deficient and that the information gleaned was stale when the warrant was executed a week later.

The district court ruled that the affidavit lacked sufficient factual details about the trash pull. It contained no information about who placed the trash outside, when it was placed there, what type of receptacle it was in, whether the trash was bagged, where it sat on the property, or how it was seized. In the court's view, those gaps prevented it from finding a sufficient connection between the trash's contents and the residence.

The court also found no connection between Gardner's vehicle and her residence: it was searched 10 days after Gardner had last been seen driving it, it was searched in Johnson County at a tow company, and Gardner had not been its exclusive driver. The court also opined that even if the vehicle could be tied to the residence, the items recovered were more indicative of personal use than distribution.

The court was also unconvinced that the short visits to Gardner's house suggested ongoing illegal activity. Detective Kennedy had observed four such visits across two dates, even though she had surveilled the house on about eight occasions. To the court, that was "hardly a high volume of traffic." And without other information about the visitors, the court thought these brief drop-ins failed to provide evidence of drug activity.

6

The district court thought the remainder of the affidavit was mostly "fluff and other meaningless observations" or "unreliable and/or uncorroborated anonymous sources, hearsay and speculation." And it concluded that "officers' documented attempts to corroborate the anonymous sources resulted in observations of lawful, innocent and innocuous human activities." It granted Gardner's motion to suppress.

The State appealed from that ruling. Parties ordinarily file an appeal only after the district court has concluded all proceedings. But K.S.A. 22-3603 allows the State to file an interlocutory appeal—an appeal taken before the case is over—when a suppression order "'substantially impairs the State's ability to prosecute the case.'" *State v. Myers*, 314 Kan. 360, 366, 499 P.3d 1111 (2021). The State appealed on that basis, and there's no dispute that standard is met here. The suppressed evidence is the foundation for the State's case against Gardner.

At the Court of Appeals, the State argued that the totality of the circumstances provided a substantial basis for issuing the warrant. It faulted the district court for a "hyper technical reading" of the affidavit, for viewing evidence in isolation rather than collectively, and for failing to give the issuing judge's decision the deference it was owed. For the first time on appeal, the State also argued that the good-faith exception saved the fruits of the search even if the affidavit failed to establish probable cause. Under that doctrine, evidence gathered in violation of the Fourth Amendment will not be excluded if officers acted in reasonable reliance on a warrant issued by a detached and neutral magistrate, even if a court ultimately finds the warrant to be invalid. See *State v. Hoeck*, 284 Kan. 441, 463-64, 163 P.3d 252 (2007).

Gardner largely adopted the district court's framing. She argued that the trash pull, the car search, and the coming and going of traffic did not individually establish a connection to drug activity at the house, and that the remaining information was innocent

or uncorroborated. She objected to the State raising the good-faith exception for the first time on appeal. She also insisted that the district court would not have embraced the good-faith exception in any event given its pointed opinion rebuking the State.

The panel majority agreed with Gardner and the district court that the affidavit failed to provide a substantial basis for probable cause. *State v. Gardner*, No. 127,541, 2025 WL 2631210, at *4-8 (Kan. App. 2025) (unpublished opinion). But it reached the merits of the State's good-faith exception argument and concluded that the exception saved the search. 2025 WL 2631210, at *9. Judge Hurst filed a separate opinion, arguing that the panel should not have considered the good-faith exception because the State had not raised it before the district court. 2025 WL 2631210, at *11-13 (Hurst, J., dissenting).

Gardner asked us to review the panel majority's decision to reach the good-faith exception and its conclusion that the exception applied. The State filed a conditional cross-petition preserving its argument that the affidavit established probable cause. We granted both.

Neither party filed a supplemental brief, and we heard argument on April 7, 2026. We have jurisdiction over this appeal under K.S.A. 20-3018(b) and K.S.A. 60-2101(b). K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

Though it was divided about reaching the good-faith exception, the Court of Appeals agreed that the affidavit failed to provide a substantial basis for probable cause. We disagree and conclude that the controlling legal standards require us to uphold the search warrant. The affidavit gave the judge who issued the warrant a substantial basis to

conclude that probable cause existed. Thus, the district court erred by suppressing the seized evidence and the panel majority was right to reverse that decision, even if for the wrong reason.

The State argues that the district court and panel majority deviated from the substantial-basis standard by conducting a piecemeal probable-cause analysis rather than considering the totality of the evidence. In its view, that approach conflicts with the standards set out in *Gates*, 462 U.S. at 238, and reaffirmed in *Wesby*, 583 U.S. at 60-62. Gardner of course believes that the lower courts got it right.

The parties don't dispute the governing law. A judge who is presented with a search-warrant application must "'consider[] the totality of the circumstances presented and make[] a practical, common-sense decision [about] whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Hensley*, 298 Kan. 422, 427-28, 313 P.3d 814 (2013). Probable cause is "'a fluid concept'" that "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,'" and it "'is not a high bar.'" *Wesby*, 583 U.S. at 57.

But when a defendant later challenges the judge's decision to issue the search warrant, the reviewing court—whether an appellate court or district court—does not ask whether the affidavit established probable cause as a matter of law. Instead, we ask whether the judge who issued the warrant had a *substantial basis* for finding probable cause. *Mullen*, 304 Kan. at 353 (citing *State v. Hicks*, 282 Kan. 599, Syl. ¶ 2, 147 P.3d 1076 [2006]). The substantial-basis standard itself is inherently deferential to judges who rule on the warrant application because they must make "a fast decision on less than perfect information, sometimes in the middle of the night" without the luxury of "time and presumably competent advocacy from both sides." *Hicks*, 282 Kan. at 612-13.

9

When answering the substantial-basis question after the fact, a reviewing court must account for "'the whole picture,'" recognizing that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Wesby*, 583 U.S. at 60-61. A reviewing court therefore must not engage in a "'divide-and-conquer analysis'" that takes facts "one by one" and "dismiss[es] outright any circumstances that were 'susceptible of innocent explanation.'" 583 U.S. at 61.

Finally, we do not defer to the district court or panel's conclusion that the judge who issued the search warrant did not have a substantial basis to find probable cause. That question turns solely on the four corners of the affidavit and involves no disputed facts or credibility determinations. *Hicks*, 282 Kan. at 612.

Viewed in isolation, much of the information in Detective Kennedy's affidavit had shortcomings. The information that the overdose victim purchased drugs from Kelly came from sources "within the Leavenworth Police Department and outside agencies," with no detail about the basis of that knowledge. A named informant provided screenshots of a conversation, but the affidavit does not explain how the informant knew the victim, whose conversation the screenshots depict, or how the informant obtained them. The anonymous tip about the red car was corroborated only by the presence of a red car at Gardner's house. There is no explanation of how the witness in the stolen-gun case knew that Kelly had traded pills for the firearm or how the suspect in that case knew Kelly had "thousands of pills." There were only four short-duration visits to Gardner's house across roughly eight surveillances. The affidavit's assertion that Kelly and Gardner are "known and self-admitted drug users" does not identify who they admitted this to or when. And the claim that both have "extensive criminal histories involving drug usage and suspected distribution" is unsupported by any detail.

Viewed in isolation, one can critique the physical evidence described in the affidavit too. The description of the trash pull does not say who placed it outside, when it

10

was placed out, or whether the items were loose or bagged. It does not establish whether Gardner's mail appeared in the same bag as the drug evidence. And police searched Gardner's vehicle 10 days after they last observed her driving it, at a tow company in Johnson County, and she was not its exclusive driver.

Despite the possible limits of each isolated fact, we conclude the totality of the information in the affidavit provided the issuing judge with a substantial basis to find probable cause.

The trash pull outside Gardner's house alone carries significant weight. It recovered baggies with missing corners, baggies still connected as if purchased in bulk, a baggie with residue testing presumptive positive for fentanyl, a broken glass pipe with methamphetamine residue, and a handwritten ledger dated "04.08" listing names and dollar amounts. It also recovered mail addressed to Gardner at her house and pieces of mail addressed to Kelly at a different address.

A judge making a practical, common-sense decision does not need to rule out every alternative explanation. When trash collected at a residence contains the resident's mail, physical indicators of drug distribution, and mail connecting another suspected distributor to that address, the most natural conclusion is that it reflects drug activity at that residence. That evidence alone goes a long way toward establishing the required connection, and the probable-cause standard demands only a fair probability, not certainty. See *Wesby*, 583 U.S. at 57.

Nor is the trash pull the only evidence. Over about six weeks, Detective Kennedy's surveillance showed that Kelly was present at Gardner's house on multiple occasions and that the same vehicles moved regularly between that address and a second suspected drug location at the Woodland Village apartment complex. Four times, individuals arrived at Gardner's house, entered, and left within a few minutes, a pattern consistent with

narcotics sales. And while the generic law-enforcement information, the screenshots of the conversation, the anonymous tip about a red car, and the statements from the related gun-theft investigation all have weaknesses, they converge on the same basic conclusion: that Kelly was distributing "blues" and Gardner's house was one of the distribution points. Fentanyl paraphernalia recovered from Gardner's repossessed vehicle further ties her residence to the drugs under investigation. And an associate whom Detective Kennedy observed at the house was linked to multiple fentanyl overdoses during the investigation.

Our task is not to decide whether probable cause existed as a matter of law. We ask whether the magistrate had a substantial basis to find a fair probability that evidence of a crime would be found at the residence. *Hensley*, 298 Kan. at 427-28. It was reasonable for the issuing judge to reach the "'practical, common-sense'" conclusion that there was "'fair probability'" that officers would find evidence of drug activity at Gardner's house. 298 Kan. at 427-28.

The State is correct that neither the district court nor the panel evaluated the affidavit in this way. The district court sorted the affidavit into a mass of "fluff" and some "notable exceptions" and then evaluated those "exceptions" in isolation. It concluded that the trash pull raised "far more questions than it provides answers," that the vehicle search did not connect drugs to the home, and that the short-duration visits were too infrequent to matter. The panel took the same approach. It held that the trash pull "does not contribute to the strength of the affidavit overall," that the vehicle search "did not provide a sufficient connection" to the home, and that the visitor traffic amounted to a "'handful of visits.'" *Gardner*, 2025 WL 2631210, at *6-7.

That is the type of "divide-and-conquer analysis" the United States Supreme Court has criticized. See *Wesby*, 583 U.S. at 60. The totality-of-the-circumstances test requires

courts to consider "'the whole picture,'" not to engage in an "'excessively technical dissection'" that evaluates each fact in isolation and discards it for failing to independently establish probable cause. 583 U.S. at 60.

We conclude the affidavit—read as a whole and consistent with the legal standard for reviewing the decision of the judge who issued the search warrant—provided a substantial basis to find probable cause. The district court erred by dissecting the affidavit into isolated components, and the panel erred by repeating that approach.

As a result, the panel need not have reached the good-faith exception, and we vacate that portion of its decision. But because the panel ultimately reversed the suppression order, the result was correct. We therefore affirm its decision as right for the wrong reason, and we need not address the other issues in this appeal. See *State v. Unruh*, 320 Kan. 260, 261, 565 P.3d 825 (2025).

Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded.

\* \* \*

STANDRIDGE, J., dissenting:  I respectfully dissent from the majority's conclusion that the affidavit established probable cause to search Gardner's home. The district court and the Court of Appeals correctly identified the affidavit's central defect:  it failed to establish a reliable nexus between suspected drug activity and the Columbia address. See *State v. Ratzlaff*, 255 Kan. 738, 750, 877 P.2d 397 (1994) ("[A]ffidavit must establish a nexus between the alleged criminal activity and the place to be searched."). Because I conclude the affidavit failed to establish probable cause, I necessarily reach the State's failure to preserve the good-faith exception, an issue the majority expressly declines to address.

13

I.   *The affidavit failed to establish probable cause.*

The warrant was supported principally by three categories of information: a single trash pull; a search of Gardner's repossessed vehicle; and limited, short-term traffic at the residence. None—alone or together—supplied probable cause.

The trash-pull allegations omitted critical facts: who collected the trash, where it was located, whether it was bagged, whether it was commingled, who placed it there, and whether the mail and contraband came from the same container. Those omissions matter. See *State v. Hicks*, 282 Kan. 599, 617, 147 P.3d 1076 (2006) ("[S]ome evidence establishing a nexus between drug evidence discovered in a garbage bag and a residence to be searched is necessary to support the conclusion that the drug evidence came from the home.").

The vehicle search likewise did not bridge the gap. The car had been repossessed, searched away from the residence, and was not shown to have been exclusively used by Gardner. The affidavit also failed to establish when the items found in the vehicle were placed there or connect them to the home. Possession evidence in a vehicle does not automatically establish probable cause to search a residence. *State v. Doile*, 244 Kan. 493, 500-01, 769 P.2d 666 (1989) (finding no probable cause to search a residence when drugs and paraphernalia were found in the defendant's vehicle but the affidavit alleged no facts indicating current drug-related activity at the residence), *disapproved on other grounds by State v. Hoeck*, 284 Kan. 441, 163 P.3d 252 (2007).

Nor did the observed traffic carry the State's burden. Four short visits over a multiweek investigation is not, without more, a "high volume" of traffic indicating drug distribution. Much of the remaining information in the affidavit consisted of

14

uncorroborated tips, hearsay, association evidence, and innocent conduct. Probable cause cannot rest on suspicion by aggregation when the affidavit never supplies the missing nexus to the place searched.

I therefore disagree with the majority's conclusion that probable cause existed.

II.  *The State failed to preserve the good-faith exception argument.*

The good-faith doctrine can apply to prevent application of the exclusionary rule to evidence obtained through an illegal search when an officer acts in objectively reasonable reliance on an invalid search warrant. *State v. Zwickl*, 306 Kan. 286, 294-95, 393 P.3d 621 (2017); see *United States v. Leon*, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

If the issue had been preserved, the State would have a narrow but plausible argument. The affidavit was weak, but not entirely bare-bones. It contained some indicia of probable cause:  suspected drug activity involving Kelly, Gardner's association with Kelly, limited traffic at Gardner's house, contraband in Gardner's car, and contraband and mail in trash attributed to the residence. Those facts may be enough to support objectively reasonable reliance on a warrant issued by a neutral judge. See *Leon*, 468 U.S. at 922-23; *Zwickl*, 306 Kan. at 294-95; *State v. Powell*, 299 Kan. 690, 700-01, 325 P.3d 1162 (2014); *Hoeck*, 284 Kan. at 451-52.

But that is not the posture of this case. The State did not argue good faith in the district court. Its written response argued only that probable cause existed. It did not invoke the good-faith exception or ask the district court to make findings on the four *Leon* limitations. See 468 U.S. at 922-23 (good-faith exception unavailable when the magistrate was misled by false information, abandoned a neutral role, the affidavit so

15

lacked probable cause that reliance was unreasonable, or the warrant was so facially deficient that officers could not reasonably rely on it). Because the State never raised the theory, Gardner had no reason to develop a factual record against it.

That matters. The State bears the burden to prove facts warranting application of the good-faith exception. See *State v. Volle*, 321 Kan. 447, 459, 580 P.3d 1223 (2025). The absence of contrary evidence in this record does not prove good faith; it proves only that the State failed to litigate the issue when factual development was possible.

Kansas preservation rules are not technical traps. They protect fairness, permit adversarial testing, and ensure appellate courts review district court decisions rather than decide undeveloped theories in the first instance. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020). Although appellate courts may sometimes consider a newly raised legal issue on proved or admitted facts, that discretion should not be exercised when the newly asserted theory depends on factual determinations since fact-finding is not the role of an appellate court. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (listing preservation exceptions); *State v. Nelson*, 291 Kan. 475, 488, 243 P.3d 343 (2010) ("[A]ppellate courts do not make factual findings, even if the record is sufficient for the court to reach the factual issues.").

This case illustrates the problem. *Leon* asks whether a reasonably well-trained officer would have known the search was illegal despite the warrant. It also asks whether the issuing judge was misled, whether the judge abandoned the neutral role, whether the affidavit so lacked indicia of probable cause that reliance was unreasonable, and whether the warrant was sufficiently particular. 468 U.S. at 922-23. Some of those inquiries require factual findings. *Zwickl*, 306 Kan. at 293. The district court made none because the State never asked it to.

16

The Court of Appeals majority therefore erred by treating the good-faith question as a clean legal issue. Judge Hurst's dissent was correct: reaching it for the first time on appeal deprived Gardner of the opportunity to present evidence, denied the district court the opportunity to weigh that evidence, and left the appellate court to resolve a burden-dependent doctrine on a record the State chose not to make.

Because probable cause was lacking, and because the State failed to preserve the only doctrine that might save the search, I would reverse the Court of Appeals' good-faith holding and affirm the district court's suppression order.